2022 IL App (1st) 211410-U

No. 1-21-1410

Third Division
September 30, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| AMERICAN ECONOMY INSURANCE COMPANY, | ) | |
| AMERICAN FIRE AND CASUALTY COMPANY, | ) | Appeal from the Circuit Court |
| AMERICAN STATES INSURANCE COMPANY, | ) | of Cook County. |
| CONSOLIDATED INSURANCE COMPANY, | ) | |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | ) | No. 20 L 13373 |
| FIRST NATIONAL INSURANCE COMPANY OF | ) | |
| AMERICA, HELMSMAN MANAGEMENT SERVICES | ) | The Honorable |
| LLC, INDIANA INSURANCE COMPANY, LIBERTY | ) | Diane M. Shelley, |
| INSURANCE CORPORATION, LIBERTY MUTUAL | ) | Judge Presiding. |
| FIRE INSURANCE COMPANY, LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY, LM INSURANCE | ) | |
| CORPORATION, OHIO SECURITY INSURANCE | ) | |
| COMPANY, PEERLESS INSURANCE COMPANY, | ) | |
| THE FIRST LIBERTY INSURANCE CORPORATION, | ) | |
| THE NETHERLANDS INSURANCE COMPANY, THE | ) | |
| OHIO CASUALTY INSURANCE COMPANY, | ) | |
| WAUSAU BUSINESS INSURANCE COMPANY, | ) | |
| WAUSAU UNDERWRITERS INSURANCE COMPANY, | ) | |
| and WEST AMERICAN INSURANCE COMPANY, | ) | |
|     Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ACCELERATED REHABILITATION CENTERS, LTD., | ) | |
| Individually and d/b/a Newsome Physical Therapy, Premier | ) | |
| Physical Therapy Services, Athletico Physical Therapy | ) | |
| ARC, and Occucare, and ATHLETICO, LTD, Individually | ) | |
| and d/b/a Athletico Physical Therapy, Sports Physical | ) | |
| Therapy, Prorehab, PC., and Occucare, | ) | |
|     Defendants-Appellants. | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court properly denied defendants' motion to dismiss or, in the alternative, to compel arbitration where the plaintiffs were not signatories to the contracts that contained arbitration clauses, nor did an exception apply that would operate to bind them to the contracts.

¶ 2    The instant appeal arises from a lawsuit filed by plaintiffs, a group of insurance companies all doing business under the trade name of Liberty Mutual Insurance, against defendants, Accelerated Rehabilitation Services, Ltd., and Athletico, Ltd., two physical therapy providers.[1] In their complaint, plaintiffs alleged that defendants fraudulently submitted bills based on services that defendants did not actually provide, which plaintiffs paid. Defendants filed a motion to dismiss the complaint pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2020)) or, in the alternative, to compel arbitration, claiming that an arbitration clause contained in defendants' contracts with third-party administrators governed plaintiffs' claims. The circuit court denied the motion to dismiss, and defendants filed an interlocutory appeal under Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4    Plaintiffs are a group of insurance companies which provide workers' compensation policies for certain employers. Between 2011 and 2020, a number of employees of these employers sought physical therapy services from defendants after suffering work-related injuries, and plaintiffs paid the bills submitted by defendants in connection with these services.

---

[1] According to plaintiffs' complaint, defendant Athletico, Ltd., acquired defendant Accelerated Rehabilitation Services, Ltd., and all of its brands in 2014.

¶ 5        In December 2020, plaintiffs filed a four-count complaint against defendants for fraud and negligent misrepresentation, alleging that their investigations had revealed "fraudulent deviations" from proper coding rules with respect to billing, which resulted in "substantial overpayments" to defendants. Specifically, plaintiffs alleged that defendants billed plaintiffs by using codes that required skilled direct patient contact in circumstances when those services were not provided.

¶ 6        Defendants filed a combined motion to dismiss the complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2020)), claiming that plaintiffs' complaint was vague and failed to provide sufficient detail to identify specific instances of alleged fraud, including when and where they allegedly occurred. The circuit court granted defendants' motion in part, dismissing three of the counts without prejudice and with leave to amend.

¶ 7        Plaintiffs filed an amended complaint in June 2021; while their complaint was substantively similar to their prior complaint, they also included 50 specific examples of defendants' allegedly improper billing. In addition, as in their original complaint, plaintiffs attached over 2000 pages of exhibits consisting of spreadsheets containing data as to the amounts paid by plaintiffs for each code at issue.[2]

¶ 8        Defendants filed a motion to dismiss the amended complaint under section 2-619 of the Code or, in the alternative, to compel arbitration. Defendants claimed that they had investigated the 50 specific claims that plaintiffs identified in the amended complaint, and at least 25 of those claims were submitted for payment pursuant to agreements containing mandatory

---

[2] The entries on the spreadsheets do not contain any identifying information as to the patient or the location of the physical therapy clinic, but include only claim numbers, dates of service, the codes charged, and the amounts billed and paid. We note that most of the spreadsheets contained in the record on appeal are cut off at one end, meaning that the column including claim numbers is not included.

arbitration provisions. Defendants contended that they had entered into those agreements with various third-party administrators (TPAs) which acted as plaintiffs' agents and plaintiffs were thereby bound by the provisions in the agreements.

¶ 9    In support, defendants submitted the affidavit of Beth Trubich (Trubich), a senior manager of billing for defendants, who averred that payors such as plaintiffs regularly contract with TPAs to assist with their responsibilities in processing patient claims and payments to health care providers. In turn, defendants contracted with such TPAs, acting as agents on behalf of the payors, in connection with their services. As part of these contracts, defendants agreed to provide their services to the payors' members at significantly lower reimbursement rates. Trubich averred that "[o]n information and belief, Payors authorized various TPAs to enter into agreements with [defendants] for these lower reimbursement rates." Trubich further averred that when defendants negotiated with TPAs, all parties were aware that they were negotiating with entities acting on behalf of the payors. With respect to plaintiffs in the instant case, Trubich averred that, "[u]pon information and belief, the Plaintiffs in this case are all Payors that have contracts with [defendants] through various TPAs to provide health care services to their members at significantly discounted rates." Specifically, Trubich identified 26 claims listed in plaintiffs' amended complaint that were processed pursuant to defendants' agreements with TPAs; the applicable TPA agreements and "Explanation of Benefits" forms demonstrating payment were also attached to Trubich's affidavit. Trubich averred that for these claims, plaintiffs paid discounted reimbursement rates, "which demonstrates that these claims were paid pursuant to rates negotiated with TPAs."

¶ 10    In response to defendants' motion, plaintiffs claimed that all of the claims contained in the spreadsheets attached to the amended complaint were directly billed to plaintiffs, not to TPAs.

Plaintiffs further argued that even if some of the examples listed in their amended complaint were sent to TPAs, that did not suggest that all of the claims at issue were processed in the same way. Plaintiffs also claimed that the arbitration clauses in the agreements between the TPAs and defendants did not govern their claims in any event, as they were not signatories to the agreements and the clauses did not cover claims for fraud.

¶ 11    On September 30, 2021, the circuit court entered an order denying defendants' motion. The court first found that it could not say as a matter of law that the 26 claims identified by Trubich were processed through TPAs, as it found that Trubich did not have any foundation for the statements contained in her affidavit. The court further found that, even assuming that the TPAs were used for those claims, plaintiffs were not bound by the arbitration clauses as they were not signatories to the agreements between the TPAs and defendants. Accordingly, the court denied defendants' motion to dismiss or, in the alternative, to compel arbitration.

¶ 12    Defendants filed a motion to reconsider and, while the motion was pending, filed a notice of interlocutory appeal. According to a joint status report filed by the parties, the circuit court denied defendants' motion to reconsider on July 11, 2022. This appeal follows.

¶ 13                                ANALYSIS

¶ 14    On appeal, defendants claim that the circuit court erred in denying their motion to dismiss or, in the alternative, to compel arbitration. A motion to compel arbitration is similar to a section 2-619 motion to dismiss in that it asks the court to dismiss an action in the circuit court based on an affirmative matter, namely, the exclusive remedy of arbitration. *Sturgill v. Santander Consumer USA, Inc.*, 2016 IL App (5th) 140380, ¶ 21; *Griffith v. Wilmette Harbor Ass'n, Inc.*, 378 Ill. App. 3d 173, 179-80 (2007). An order granting or denying a motion to compel arbitration is injunctive in nature and is therefore appealable under Rule 307(a). *Herns*

*v. Symphony Jackson Square LLC*, 2021 IL App (1st) 201064, ¶ 14. In reviewing the denial of a motion to compel arbitration, questions of law are reviewed *de novo*, while findings of fact are reviewed for an abuse of discretion. *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2022 IL App (1st) 210984, ¶ 43.

¶ 15    When a party files a motion to compel arbitration, the circuit court considers only "gateway" matters, such as the existence of an agreement to arbitrate and the scope of that agreement, and does not rule on the merits of the underlying claim. *Sturgill*, 2016 IL App (5th) 140380, ¶ 22. "The party seeking to compel arbitration has the burden to establish that the parties have a valid agreement to arbitrate and that the controversy falls within the scope of the arbitration provision." *Id.* If the opposing party denies the existence of the agreement to arbitrate, the circuit court must render a substantive disposition of the issues raised by the motion; such a disposition does not dispose of the motion in a conclusory fashion but "is a more considered disposition in which the trial court separately addresses each issue raised by the motion, supporting its resolution of each issue with specific factual findings or legal reasons." *Id.* ¶ 24. Where there is a valid arbitration agreement and the parties' dispute falls within the scope of the agreement, arbitration is mandatory and the circuit court must compel it. *Griffith*, 378 Ill. App. 3d at 180.

¶ 16    In this case, the circuit court found that defendants had not established that the claims at issue were processed through the TPAs. The court, however, also found that even assuming that the claims were processed through the TPAs, the TPA agreements were not enforceable against plaintiffs, as they were not signatories to the agreements. Thus, the court's decision was based on its finding that there was no valid agreement to arbitrate between the parties. As we agree with the circuit court's findings as to the unenforceability of the agreements against

plaintiffs, we have no need to review its findings about whether the claims at issue were, in fact, processed through the TPAs.[3]

¶ 17        The right to compel arbitration stems from an underlying contract and, therefore, it generally may not be invoked by a nonsignatory to the contract. *Caligiuri v. First Colony Life Insurance Co.*, 318 Ill. App. 3d 793, 800 (2000). Courts, however, have recognized certain exceptions to this general rule, including (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing or alter ego, and (5) estoppel. *Id.* Here, defendants contend that two of these exceptions apply to the instant case: agency and estoppel. Defendants further claim, in the alternative, that plaintiffs are bound by the arbitration clauses as third-party beneficiaries of the agreements between defendants and the TPAs. We consider each argument in turn.

¶ 18                                                    *Agency*

¶ 19        Defendants first claim that the TPAs were plaintiffs' agents and, therefore, plaintiffs were bound by the arbitration clauses. A nonsignatory party may be bound to an arbitration agreement if it was signed by the party's agent. *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 891 (2010); *Daley v. Alden-Town Manor Rehabilitation & Health Care Center, Inc.*, 2022 IL App (1st) 211619-U, ¶ 33. The scope of an agency relationship depends on the terms of the agreement between the principal and the agent and the intent of the parties. *Curto*, 405 Ill. App.

---

[3] We note that agreements to arbitrate will be enforced even in multiparty litigation where only some of the parties are subject to arbitration agreements. *Board of Managers of Courtyards at Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 74 (1998). Thus, if some of the claims in the instant case were arbitrable, they would be required to be arbitrated while the remaining claims would be litigated in the circuit court. See *id.* at 74-75 (if there is a multiplicity of actions, the court may stay the proceeding, or a severable issue within it, pending arbitration). As we explain in our analysis, however, we agree with the circuit court that none of the claims are arbitrable, as plaintiffs were not signatories to the contracts between defendants and the TPAs.

3d at 892. The party claiming an agency relationship has the burden of establishing it by a preponderance of the evidence. *Id.*; *Daley*, 2022 IL App (1st) 211619-U, ¶ 34.

¶ 20      An agent's authority may be either actual or apparent. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 34. Furthermore, actual authority may be either express or implied. *Id.* While defendants do not specifically identify they type of authority they claim the TPAs had with respect to plaintiffs, their argument that "Plaintiffs have authorized TPAs to enter into the agreements with Defendants" suggests that their claim is based on express authority. "Express authority is directly granted to the agent in express terms by the principal and extends only to the powers the principal confers upon the agent." *Curto*, 405 Ill. App. 3d at 892; *Daley*, 2022 IL App (1st) 211619-U, ¶ 34. Such authority may be granted through a written contract, a power of attorney, or a court-ordered guardianship. *Curto*, 405 Ill. App. 3d at 892.

¶ 21      In this case, while defendants provided copies of several agreements between the TPAs and defendants, the record does not include any information as to the relationship between the TPAs and *plaintiffs*. At best, Trubich's affidavit provided that "[o]n information and belief," plaintiffs authorized TPAs to enter into agreements with defendants. There is no support for this statement, however, other than inferences drawn from the usual course of conduct and the fact that TPAs act on behalf of insurers generally. Even if true, the general duties and scope of a TPA's power do not establish that *these* TPAs were acting as agents on behalf of *these* plaintiffs with respect to *these* agreements.

¶ 22      Defendants contend that if the TPAs were not plaintiffs' agents, "Plaintiffs could have easily introduced evidence at the circuit court to refute that theory." Defendants overlook, however, that they have the burden of establishing the agency relationship, not plaintiffs, and

that they have the burden of establishing the applicability of the arbitration clause. See *Curto*, 405 Ill. App. 3d at 892 (the party claiming an agency relationship has the burden of proving it); *Sturgill*, 2016 IL App (5th) 140380, ¶ 22 (the party seeking to compel arbitration has the burden of proving a valid arbitration agreement). An affidavit that merely suggests that an agency relationship exists, without personal knowledge or other proof of that relationship, does not suffice to meet that burden. Accordingly, we agree with the circuit court that plaintiffs were not bound by the arbitration agreements by way of an agency relationship with the TPAs.

¶ 23                                                               *Estoppel*

¶ 24           Next, defendants claim that plaintiffs were bound by the arbitration agreements through estoppel. Defendants primarily rely on *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380 (7th Cir. 2014), a case which applied "direct benefits estoppel" to bind a nonsignatory to an arbitration agreement.[4] In that case, the defendant entered into a franchise agreement with a company and one of its owners, Matthew Everett; the other owner of the company was Matthew Everett's wife, plaintiff Renee Everett (Renee). *Id.* at 382. After the termination of the franchise agreement, the Everetts transferred almost sole ownership of the company to Renee (another employee owned 5%), allegedly to avoid a post-termination restrictive covenant contained in the franchise agreement. *Id.* at 382-83. The defendant initiated arbitration, and Renee filed suit in federal court, seeking a declaratory judgment that she was not bound by the arbitration clause in the franchise agreement since she never signed the agreement. *Id.* at 383. The dispute eventually reached the Seventh Circuit Court of Appeals,

---

[4] We note that defendants acknowledge that no Illinois cases have applied this doctrine and rely solely on federal law to support their argument. We have no need to discuss whether direct benefits estoppel may be used to bind a nonsignatory to an arbitration agreement under Illinois law, however, as we agree with the circuit court that defendants have not established its applicability to the instant case in any event.

which was asked to determine whether Renee could be bound by the arbitration clause despite never signing the franchise agreement.

¶ 25    In its analysis, the *Everett* court found that "direct benefits estoppel" applied to bind Renee to the arbitration clause. Under this doctrine, "a non-signatory party is estopped from avoiding arbitration if she 'knowingly seeks the benefits of the contract containing the arbitration clause.' " *Id.* (quoting *Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682, 688 (7th Cir. 2005)). In order for the doctrine to apply, the benefit received by the nonsignatory must flow directly from the agreement. *Id.* Thus, as the *Everett* court explained, "a benefit derived from the agreement itself is direct. However, a benefit derived from the exploitation of the contractual relationship of parties to an agreement, but not the agreement itself[,] is indirect." *Id.* at 383-84. In the case before it, the *Everett* court found that Renee received a benefit from the franchise agreement itself, including the ownership of a franchise and the ability to trade upon the name, goodwill, and reputation of the defendant. *Id.* at 384.

¶ 26    In this case, by contrast, we cannot find that the record shows that plaintiffs received benefits flowing directly from the agreements between the TPAs and defendants. First, as the circuit court noted, while defendants contend that plaintiffs received beneficial pricing due to the agreements, there is no evidence in the record to support that claim. At best, Trubich's affidavit provides that "[u]pon information and belief, the Plaintiffs in this case are all Payors that have contracts with [defendants] through various TPAs to provide health care services to their members at significantly discounted rates." Even if true, however, there is no information

10

as to defendants' typical fees for these services, or the discounted rate allegedly received by plaintiffs' members.[5]

¶ 27       Additionally, any direct benefits flowing from the TPA agreements were received by defendants and the TPAs—defendants benefitted by being listed in the TPAs' provider networks, and the TPAs benefitted by building a network of providers offering efficient and cost-effective health care services for covered individuals. If, as defendants allege, the reduced rates charged by them pursuant to that contractual relationship were passed on to plaintiffs, that benefit flowed from plaintiffs' ability to exploit the contractual relationship between defendants and the TPAs, not from the TPA agreements themselves. This, by definition, is an indirect benefit. See *Everett*, 771 F.3d at 383-84 ("a benefit derived from the exploitation of the contractual relationship of parties to an agreement, but not the agreement itself[,] is indirect"). Accordingly, we cannot find that the doctrine of direct benefits estoppel served to bind plaintiffs to the arbitration clauses contained in the TPA agreements.

¶ 28                                            *Third-Party Beneficiary*

¶ 29       Finally, defendants contend that plaintiffs were bound by the TPA agreements as third-party beneficiaries. There are two types of third-party beneficiaries under Illinois law—intended and incidental—and only intended beneficiaries have any rights under the contract. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 14. An intended third-party beneficiary is "one whom the parties intended to directly benefit from the contract."

_____

[5] We note that the Workers' Compensation Commission has established fee schedules setting forth maximum rates for certain medical procedures, treatments, and services (see 820 ILCS 305/8.2 (West 2020)), and the TPA agreements contained in the record on appeal set reimbursement rates based on those fee schedules. It is unclear from the "Explanation of Benefits" documents contained in the record on appeal whether the documents list defendants' typical fees or fees based on the fee schedule, or the relationship between defendants' typical fees and the allegedly discounted rates received under the TPA agreements.

*Bank of America National Ass'n v. Bassman FBT, L.L.C.*, 2012 IL App (2d) 110729, ¶ 27. By contrast, an incidental third-party beneficiary is one who receives an unintended benefit from the contract. *Id.* "The operative question is whether the parties to the contract intended to confer a *direct* benefit on the purported third-party beneficiary." (Emphasis in original.) *Id.* There is a strong presumption that the parties to a contract intend the contract to apply only to them and not to third parties. *Id.*; *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020 (2009). "That the contracting parties know, expect, or even intend that others will benefit from their agreement is not enough to overcome the presumption that the contract was intended for the direct benefit of the parties." *Martis*, 388 Ill. App. 3d at 1020.

¶ 30        Here, defendants claim that plaintiffs were intended beneficiaries of the agreements between the TPAs and defendants—in fact, they claim that "the TPA agreements exist solely to provide a direct financial benefit to insurers." We do not find this argument persuasive. Even assuming plaintiffs did obtain a financial benefit resulting from the agreements, that does not automatically transform them into intended third-party beneficiaries to the agreements. Moreover, defendants' argument overlooks the fact that both defendants and the TPAs directly benefited from the agreements—as explained above, defendants received the benefit of being listed in the TPAs' provider network, while the TPAs received the benefit of an expansive network of health care providers providing cost-effective services. As the circuit court noted, defendants also received an additional benefit in that use of the TPAs streamlined the processing and payment of claims, meaning that defendants could more easily be paid for services rendered. Thus, defendants' claim that the TPA agreements existed "solely" to provide a direct financial benefit to insurers is simply incorrect. The fact that plaintiffs received some

benefit from the TPA agreements did not make them third-party beneficiaries and, accordingly, the circuit court properly found that they were not bound by the agreements.

¶ 31                                                    CONCLUSION

¶ 32        For the reasons set forth above, the circuit court properly denied defendants' motion to dismiss or, in the alternative, to compel arbitration. Even if the TPA agreements applied to all of the claims at issue, plaintiffs were not bound by the arbitration clauses contained in those agreements, as they were not signatories to the agreements and the record does not show that an exception that would bind them to the agreements applies.

¶ 33        Affirmed.